Gerald W. Griffin
CARTER LEDYARD & MILBURN LLP
Two Wall Street
New York, New York 10005
Telephone: (212) 238-8672
Facsimile: (212) 732-3232
griffin@clm.com
Attorneys for Plaintiff American National Standards Institute

JUDGE KAPLAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 0134

---

AMERICAN NATIONAL STANDARDS INSTITUTE

        Plaintiff,

   v.

CACTUS COMMERCE, INC.

        Defendant.

COMPLAINT AND JURY DEMAND

JAN 0 7 2013
U.S.D.C.

---

Plaintiff American National Standards Institute ("ANSI"), by its attorneys Carter Ledyard & Milburn LLP, as and for its complaint against Cactus Commerce, Inc., ("Cactus"), alleges as follows:

## INTRODUCTION

1. This is an action for breach of contract, breach of warranty, breach of the covenant of good faith and fair dealing, and unjust enrichment arising out of the following four agreements between the parties pursuant to which Cactus agreed to provide ANSI redesigned websites with, among other things, enhanced search, search engine optimization and web analytic capabilities: (1) Master Services Agreement dated August 26, 2009, as amended by Modification #1 to the Master Services Agreement dated January 7, 2010 (the "MSA"), (2) Statement of Services dated August 27, 2009 (the "SOS"), (3) Statement of Work dated January 13, 2010 (the "Helios SOW"), and (4) Statement of Work dated February 18, 2011 (the "IDM

SOW"). The MSA, SOS, Helios SOW, and IDM SOW are attached hereto as Exhibits A, B, C, and D respectively.

2. Cactus breached these agreements, their warranty, the covenant of good faith and fair dealing, and has been unjustly enriched by, among other things: (1) failing to deliver redesigned websites within the time frame prescribed by the agreements, or within a reasonable time thereafter, (2) failing to adequately design and develop the websites in accordance with ANSI's business goals, (3) failing to stabilize and test the websites prior to its delivery to ANSI, (4) failing to deliver redesigned websites that could perform in accordance with their functional description in the agreements, (5) failing to devote sufficient and appropriately competent resources to the project after underestimating its complexity and cost, (6) procuring milestone payments under the agreements by false representations that work had been completed, and (7) failing to refund ANSI's payments under the agreements.

3. ANSI seeks monetary damages in an amount to be determined at trial, but not less than $1,383,900, the amount ANSI has paid Cactus under the agreements.

**PARTIES**

4. ANSI is a private not-for-profit organization that is organized under section 501(c)(3) of the United States Internal Revenue Code (26 U.S.C. § 501(c)(3)) that has a principal place of business at 25 West 43rd Street, New York, New York, 10036, and additional offices at 1899 L Street, Washington, D.C., 20036.

5. ANSI's mission is to enhance both the global competitiveness of American business and American quality of life by promoting and facilitating voluntary consensus standards and conformity assessment systems and safeguarding their integrity. To this end, ANSI establishes, promulgates and administers procedures and criteria for accreditation programs relating to voluntary standards and related activities in the United States through which

2

organizations concerned with such activities may cooperate in establishing, improving and recognizing standards based on a consensus of parties in interest.

6. ANSI's membership is comprised of businesses, professional societies and trade associations, standards developers, government agencies, consumers and labor organizations. ANSI communicates with its members, and the general public, through three primary websites: ANSI.org, NSSN.org and Webstore.ANSI.org (the "Websites"). ANSI derives much of its revenue to support its mission from services it offers to members and the public on its Websites, including on-line sales of standards and related publications, accreditation services, fee-based programs, event registrations, and training and education.

7. Cactus is a privately held Canadian corporation that has a principal place of business at 490 St. Joseph Boulevard, Gatineau, QC, Canada, J8Y 3Y7.

8. Cactus is a web design company that offers custom built digital commerce and marketing solutions through its product CommerceLive. CommerceLive is a "Microsoft e-commerce solution leveraging SharePoint Server for Internet Sites and Microsoft Commerce Server, featuring integration with FAST Search Server for SharePoint." According to Cactus, CommerceLive provides "a complete customer engagement solution" that "is used in B2C and B2B scenarios to help retailers, manufacturers and consumer goods companies to engage, interact and transact with customers online." http://www.cactuscommerce.com/commercelive.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Cactus because Cactus has, among other things, transacted business in this District and contracted to supply services and products to

3

ANSI in this District, which give rise to ANSI's claims against Cactus. In addition, the parties agreed in the MSA that any dispute or claim arising out of or in connection with their agreements or the performance, breach or termination thereof, will be subject to the jurisdiction of the state and federal courts of New York, and to submit such matters exclusively to such courts. Exhibit A at § 13(c).

11. Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### The Parties' Agreements

12. On August 26 and 27, 2009, ANSI and Cactus entered into the MSA and SOS respectively. Under the SOS, Cactus agreed to provide ANSI with a fixed price proposal for a complete redesign of ANSI's Websites. The "primary goal of the redesign" was to increase ANSI's revenue by increasing ANSI's "membership, publications sales, accreditation and other services" that ANSI offered on its Websites. Another key objective was to enhance the user experience of ANSI's staff and customers. These goals were to be achieved through the creation of consistent and integrated websites with enhanced search, search engine optimization, and web analytic capabilities. Exhibit B at 3.

13. Specifically, the SOS provided that ANSI would pay Cactus $52,000 to complete an "Envisioning Phase" and initiate a "Planning Phase" for the redesign project during which Cactus would, among other things:

> [d]evelop a high level understanding of [ANSI's] current architecture and integration points to Microsoft Commerce Server 2007, BizTalk, Microsoft Office SharePoint Server 2003 and other systems and web sites;
>
> . . . identify and document functional requirements at a high level to support ANSI's business and ecommerce objectives; and

4

> . . . provide an outline of Services to be performed for [the] remainder of [the] project, [that would] include a fixed price [ ] to complete [the project] and [a] project timeline.

Exhibit B at 5-6, 13.

14. The Envisioning and the start of the Planning Phase under the SOS began in September 2009, and lasted approximately five weeks, during which Cactus conducted an on-site inspection of ANSI's Websites and interviews of ANSI's staff at ANSI's offices in New York, New York. Cactus also discussed the Websites with ANSI's members and customers. In October 2009, after completing its detailed investigation of ANSI under the SOS, Cactus represented to ANSI that it could redesign the Websites using Microsoft SharePoint to accomplish ANSI's business goals of enhancing its search, search engine optimization and web analytic capabilities. On January 15, 2010, ANSI paid Cactus $52,000 for the work it performed under the SOS.

15. As a result of Cactus' investigation and findings under the SOS, on January 13, 2010, ANSI and Cactus entered into the Helios SOW, a fixed price contract for the redesign of ANSI's Websites. The Helios SOW described ANSI's existing Websites as "a disparate set of web sites that are difficult to navigate," with "search functionality that is very fragmented and difficult to use" and a "complex set of integrations and data flows that are not sufficiently tracked and maintained." Exhibit C at 4. The Helios SOW, like the SOS, summarized ANSI's business goals as

> seeking a more professional and consistent online presence that demonstrates the breadth, depth and range of services it provides, increases the functionality and ease-of-use of its multiple websites, increases on-line sales revenue and enhances its site license platform to support the sale and delivery of content for multi-user access.

Exhibit C at 4.

16. This goal, again, was to be achieved by, among other things, "improving search functionality across all of ANSI's web sites", "optimizing search engine capabilities" and "enabl[ing] web analytics" through the use of "the latest Microsoft-based technologies . . . .", specifically, Microsoft SharePoint. Exhibit C at 5, 51.

17. ANSI agreed to pay Cactus six payments totaling the fixed price of $1.3 million during the course of the redesign project, plus travel and logistic expenses. The payments were to be made after specific milestones, including after Cactus' successful completion of the four remaining phases of the project: the Planning Phase, the Design/Development Phase, the Stabilization/Testing Phase, and the Deployment Phase. Exhibit C at 21-22.

18. For its part, Cactus agreed to deliver to ANSI redesigned websites in the form of a single computer code drop, after it further established the business requirements of the code during the remainder of the Planning Phase, designed the code in accordance with the business requirements during the Design/Development Phase, and stabilized and tested the code for quality assurance during the Stabilization/Testing Phase. Exhibit C at 10-11.

19. Upon delivery of the code, ANSI was to have two (2) weeks to perform its own User Acceptance Testing ("UAT") of the code to determine if it worked in ANSI's environment. Once UAT was completed and the code was approved by ANSI, Cactus was to deploy the final code to ANSI during the Deployment Phase of the project. Exhibit C at 11.

20. Under the Helios SOW, the project was to begin around January 18, 2010 and last approximately 27 weeks, with a final schedule to be completed by Cactus during the remainder of the Planning Phase. Exhibit C at 21. Cactus finalized the schedule during the Planning Phase and agreed to complete the Planning Phase by March 3, 2010, the Design/Development Phase by April 30, 2010, and the Stabilization/Testing Phase by July 12, 2010. It further agreed that ANSI

would perform UAT of the code in August 2010, and that Cactus would deploy the final code in September 2010.

21. Cactus also warranted that the computer code would perform in accordance with its functional description in the Helios SOW for ninety days after ANSI completed UAT. Specifically, the Helios SOW provided:

> As stated in the [MSA]: "We warrant for your benefit only that for a period of ninety (90) days following delivery of the Services and/or Service Deliverable(s), that each such Services and/or Services Deliverable(s) will perform materially in accordance with the functional description or specification defined in this SOW."
>
> For purposes of clarity the final service deliverable, the fully integrated ANSI-customized CommerceLive Solution code deliverable will perform materially in accordance with the specification set forth in the ANSI-approved UAT test cases written deliverable and the (90) day period for such final service deliverable shall begin following the successful completion of UAT.

Exhibit C at 21.[1]

22. On February 18, 2011, ANSI entered into the IDM SOW, a second statement of work under which Cactus agreed to provide ANSI with an "IDM Re-Platforming Solution", a system for managing and synchronizing user account access privileges and contact information. This was necessary because many different kinds of users would have access to ANSI's redesigned websites, and the "permissioning" for access by these various visitors had to be managed and kept synchronized at all times. The fees for this project were fixed at $296,900 and the payments were to be made by ANSI in accordance with a payment schedule that was tied to the completion of four milestones. Exhibit D at 15.

---

[1] The terms of the MSA were incorporated by reference in the Helios SOW. Exhibit C at 4.

7

**Cactus Breached the Agreements and Warranty**

23. Cactus failed to complete the phases of the project in accordance with the agreed upon schedules under the Helios SOW and IDM SOW, and during the course of the project repeatedly requested more time from ANSI to complete the code and the IDM platform. Despite Cactus modifying the schedules several times during the course of the project, which extended the initial term of the Helios SOW from twenty-seven (27) weeks to approximately two years, Cactus was unable to deliver a completed functional code to ANSI for UAT and deployment, or an IDM platform. Cactus' failure to deliver the code and platform was a result of its refusal to devote sufficient and appropriately competent resources to the project after it underestimated its complexity and cost, and its reliance on Microsoft SharePoint to accomplish ANSI's business goals. Despite Cactus' representations, SharePoint was incapable of enhancing ANSI's search, search engine optimization and web analytic capabilities.

24. Cactus' failures began to surface during the Design/Development Phase of the project, which was initially estimated to be completed by the end of April 2010, but did not begin until April 2010. During this phase, Cactus was to develop and design software requirements for specific Business Requirements ("BRs") identified in the Helios SOW, and divided into 16 separate business areas. Exhibit C at 27. The software requirements were memorialized in separate documents referred to as "Software Requirements Documents" ("SRDs"). From April 2010 through July 2011, Cactus wrote and rewrote SRDs, but was never able to adequately develop and design software for the BRs in all 16 business areas.

25. As Cactus continued to work on the SRDs, it became clear that Cactus had underestimated the complexity and cost of the project. As a result, the parties entered into 35 "Change Requests" to the Helios SOW over the course of the Design/Development and

8

7133300.1

Stabilization/Testing Phases, which collectively were priced at an additional $376,000 to ANSI. Copies of the Change Requests are attached hereto as Exhibit E. Cactus also terminated its project manager, Mark Hoekstra, who was largely responsible for Cactus entering into the Helios SOW, and replaced him with Drago Farsang. Cactus also began reducing the amount of personnel working on the project, while requesting that ANSI personnel assist Cactus in its performance of the contract.

26. Despite the Change Requests and ANSI's assistance, Cactus could not get the project back on schedule and under budget. By June 2011, Cactus had extended the schedule so as to complete the Design/Development Phase by July 12, 2011, the Stabilization/Testing Phase by July 29, 2011, and to deliver the code for UAT by August 11, 2011. Cactus, however, knew at this time that it was unable to meet the revised schedule because it was unable to adequately develop and design SRDs for all 16 business areas.

27. Regardless, in July 2011, Cactus falsely represented to ANSI that the Design/Development Phase was completed to induce ANSI's milestone payment of $200,000 for the completion of this phase, which ANSI paid on August 18, 2011. ANSI would not have made this payment but for Cactus' false claims that this phase was in fact complete.

28. On August 2, 2011, rather than delivering a single code as required under the Helios SOW, Cactus delivered partial code, which included software for only six of the sixteen business areas, only one of which was functional. On October 6, 2011, Cactus delivered additional code containing software for three more business areas, all of which were not functional. In addition, ANSI could not proceed to UAT with partial code and the project was further delayed. At this time, Cactus promised to make a third and final delivery of code after it

9

completed the Stabilization/Testing Phase of the project. Cactus, however, had no intention of devoting, and did not devote, the resources necessary for the completion of this phase.

29. In November 2011, Cactus falsely represented to ANSI that it had completed the Stabilization/Testing Phase of the project and conditioned the delivery of code on ANSI's milestone payment of $200,000 for the completion of this phase, which ANSI paid on November 29, 2011. ANSI would not have made this payment but for Cactus' false claims that this phase was in fact complete and that Cactus would not deliver the code to ANSI and allow ANSI to proceed to UAT until the payment was received.

30. The parties also agreed at this time to a final Change Request ("CR 35") under which they agreed to defer the final $300,000 payment for completion of the Deployment Phase until after a number of events had occurred, including UAT, which was rescheduled for completion by February 3, 2012. Exhibit E-35 at 1. By this time, Drago Farsang the second project manager assigned to the project had resigned from Cactus, and many of the other Cactus employees who were originally assigned to the project were moved to other projects or had also left the company.

31. Cactus made its third and final delivery of code on December 2, 2011, approximately two years after the start of the project. Again, the code was incomplete, missing software for four of the sixteen business areas, which again prevented ANSI from proceeding to UAT and further delayed the project. In addition, the code was largely unusable because of design defects, bugs, missing functionality, and the fact that it had not been integrated with the IDM platform, which was still under development and had not been delivered by Cactus under the schedule agreed to in the IDM SOW. Despite its prior representations, Cactus had not stabilized or tested the code for quality assurance prior to delivering it to ANSI. ANSI also hired

7133300.1

another web design company to assess Cactus' deliverable, and it determined that the code's architecture, which was based on Microsoft SharePoint, was incapable of accomplishing ANSI's business goals of enhancing its Websites' search, search engine optimization and web analytic capabilities.

32. In 2012, the parties engaged in continued discussions regarding the inadequacy and lack of functionality of the code, during which Cactus proposed new schedules and solutions. During these communications, ANSI noticed Cactus of its several breaches of the agreements, including the constant delays in the completion of the phases of the project, the inadequacy and incompetency of the staff Cactus had assigned to the project, and the specific deficiencies in the code that Cactus had delivered. Cactus was unable, and did not cure these breaches.

33. By July 2012, the parties were at an impasse, as it had become clear to ANSI that Cactus could not deliver redesigned websites that were usable by ANSI and its members or that improved upon its current Websites. ANSI has demanded that Cactus refund its payments under the Helios SOW and IDM SOW, but Cactus has refused to do so.

## COUNT I
## Breach of Contract – SOS

34. ANSI repeats and realleges the allegations set forth in paragraphs 1 through 33 hereof as if set forth fully herein.

35. The SOS is a valid and enforceable contract.

36. ANSI has fully performed its obligations under the SOS.

37. Cactus has breached the SOS by failing to develop a high level of understanding of ANSI's Websites and identify and document functional requirements at a high level to support ANSI's business and ecommerce objectives.

11

7133300.1

38. As a result of Cactus' breaches of the SOS, ANSI has sustained damages in an amount to be determined at trial, but not less than $52,000.

## COUNT II
## Breach of Contract – Helios SOW

39. ANSI repeats and realleges the allegations set forth in paragraphs 1 through 38 hereof as if set forth fully herein.

40. The Helios SOW is a valid and enforceable contract.

41. ANSI has fully performed its obligations under the Helios SOW.

42. Cactus has breached the Helios SOW by failing to deliver redesigned websites within the time frame prescribed by the agreement, or within a reasonable time thereafter.

43. Cactus has further breached the Helios SOW by failing to adequately design and develop the websites in accordance with ANSI's business goals.

44. Cactus has further breached the Helios SOW by failing to stabilize and test the websites prior to its delivery to ANSI.

45. Cactus has further breached the Helios SOW by failing to devote sufficient and appropriately competent resources to the project after underestimating its complexity and cost.

46. Cactus has further breached the Helios SOW by failing to refund ANSI's payments under the agreement.

47. As a result of Cactus' breaches of the Helios SOW, ANSI has sustained damages in an amount to be determined at trial, but not less than $1,383,900.

## COUNT III
## Breach of Contract – IDM SOW

48. ANSI repeats and realleges the allegations set forth in paragraphs 1 through 47 hereof as if set forth fully herein.

49. The IDM SOW is a valid and enforceable contract.

50. ANSI has fully performed its obligations under the IDM SOW.

51. Cactus has materially breached the IDM SOW by failing to deliver an IDM platform within the time frame prescribed by the agreement, or within a reasonable time thereafter.

52. As a result of the Defendant's breaches of the IDM SOW ANSI has sustained damages in an amount to be determined at trial, but not less than $1,383,900.

## COUNT IV
### Breach of Warranty – Helios SOW

53. ANSI repeats and realleges the allegations set forth in paragraphs 1 through 52 hereof as if set forth fully herein.

54. Cactus provided ANSI a valid warranty in the Helios SOW.

55. Cactus breached the warranty by delivering redesigned websites that could not perform in accordance with their functional description in the agreements.

56. As a result of Cactus' breach of warranty, ANSI has sustained damages in an amount to be determined at trial, but not less than $1,383,900.

## COUNT V
### Breach of the Covenant of Good Faith and Fair Dealing – Helios SOW

57. ANSI repeats and realleges the allegations set forth in paragraphs 1 through 56 hereof as if set forth fully herein.

58. The Helios SOW includes an implied covenant of good faith and fair dealing.

59. Cactus breached the implied covenant of good faith and fair dealing by, among other things, procuring milestone payments under the agreement by false representations that work had been completed.

60. As a result of Cactus' breach of the covenant of good faith and fair dealing, ANSI has sustained damages in an amount to be determined at trial, but not less than $400,000.

## COUNT VI
## Unjust Enrichment

61. ANSI repeats and realleges the allegations set forth in paragraphs 1 through 60 hereof as if set forth fully herein.

62. Cactus is not entitled to keep the monies paid by ANSI, but has failed or refused to return the money to ANSI as a means of extracting a benefit to which it is not entitled.

63. Cactus' refusal to return the money and fraudulent billing of ANSI for work it did not complete is unjust and inequitable.

64. Cactus has been unjustly enriched at ANSI's expense.

65. As a result of Cactus' conduct, ANSI has sustained damages in an amount to be determined at trial, but not less than $1,383,900.

## PRAYER FOR RELIEF

WHEREFORE, ANSI prays for relief and judgment against Cactus as follows:

A. Entering judgment for ANSI and against Cactus on Counts, I, II, III, IV, V, and VI;

B. Awarding ANSI damages in amount to be determined at trial, but not less than $1,383,900;

C. Awarding ANSI pre-judgment and post-judgment interest; and

D. Grant such other and further relief as is just and proper.

7133300.1

## JURY DEMAND

ANSI hereby demands a trial by Jury.


Dated: January 7, 2013
                                       CARTER LEDYARD & MILBURN LLP

By _____
Gerald W. Griffin (2778)
griffin@clm.com
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
(212) 732-3200
Attorneys for Plaintiff
American National Standards Institute